# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Marcia K. Petersen,                              Civ. No. 08-4771 (RHK/JJK)

       Plaintiff,

v.                                               **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of the Social
Security Administration,

       Defendant.

---

Jennifer G. Mrozik, Esq., Northwest Disability Services, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Marcia K. Petersen seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits.  This matter is before this Court for a Report and Recommendation to the District Court on the parties' cross-motions for summary judgment.  *See* 28 U.S.C. § 636; D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends that Plaintiff's Motion for Summary Judgment (Doc. No. 5) be denied, and that Defendant's Motion for Summary Judgment (Doc. No. 12) be granted.

## BACKGROUND

### I.    Procedural History

Plaintiff filed an application for disability insurance benefits on October 27, 1999, alleging a disability onset date of May 6, 1994.  (Tr. 19.)[1]  Her date last insured is March 31, 1999.[2]  (Tr. 22.)  The application was denied initially, on reconsideration, and on appeal to the Appeals Council.  On January 2, 2002, the United States District Court affirmed the denial of the application.  (Tr. 19.)

On May 1, 2003, Plaintiff filed a second application for disability insurance benefits.  (*Id.*; Tr. 100-02.)  The second application was denied initially and on reconsideration based on res judicata.  On July 23, 2004, an Administrative Law Judge ("ALJ") found that res judicata did not apply because there was new and material evidence in the file and because the listings for the musculoskeletal system had significantly changed.  (Tr. 19, 35-41.)  The ALJ remanded the claim to the state agency for a decision on the merits of the claim.  (Tr. 41.)  The claim was thereafter denied both initially and on reconsideration.  (Tr. 19, 48-56, 58-66.)  Plaintiff timely requested a hearing, which was held before an ALJ on July 17, 2007.  (Tr. 20, 756-75.)

---

[1]    Throughout this Report and Recommendation, reference to the administrative transcript for the present case, Civ. No. 08-4771 (RHK/JJK), is made by using the abbreviation "Tr."

[2]    A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).

On August 31, 2007, the ALJ issued an unfavorable decision.  (Tr. 17-30.)
Plaintiff sought review of the ALJ's decision by the Appeals Council, but the
Appeals Council denied the request for review on May 22, 2008.  (Tr. 9-12.)  The
ALJ's August 31, 2007 decision therefore became the final decision of the
Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  On July 25, 2008, Plaintiff
filed the instant action with this Court seeking judicial review pursuant to 42
U.S.C. § 405(g).  The parties thereafter filed cross-motions for summary
judgment.  *See* D. Minn. Loc. R. 7.2.

## II.    Factual Background and Medical History

Plaintiff was born on March 15, 1950.  (Tr. 42.)  At the time of her date last
insured, she was 49 years old, and at the time of the ALJ's decision, she was 57
years old.  Plaintiff graduated from high school, completed some college courses
over the span of two years, and previously worked as a trade-show
merchandiser at the light and skilled level, a scheduler at the sedentary and
semi-skilled level, a medical assistant at the light and skilled level, an office
manager at the sedentary and skilled level, and an administrative assistant at the
sedentary and skilled level.  (Tr. 186-87, 376.)

On May 6, 1994, Plaintiff was involved in an automobile accident.
(Tr. 195.)  On May 11, 1994, Plaintiff was treated by Dr. Essam A. Awad for her
injuries.  (Tr. 377.)[3]   Plaintiff complained of headaches, tightness in the right

---

[3]      Plaintiff had previously been in an automobile accident in 1982, and had
(Footnote Continued on Next Page)

upper extremity, neck pain, low back pain, and tightness and numbness in the

fingers.  (Tr. 377.)  At that time, Dr. Awad reported that Plaintiff had limited range

of motion in the neck, and that there was evidence of muscle spasm in the

paracervical and lumbo-sacral muscles.  (Tr. 377; *see also* Tr. 747-48.)

Dr. Awad also noted that Plaintiff had a mild weakness of the right hand grip, and

tenderness to palpation of the cervical and lumbosacral spine.  (Tr. 377; *see also*

747-48.)  Dr. Awad diagnosed Plaintiff with spinal sprain, neck pain, and back

pain, with bruises on her right elbow and left leg; recommended three physical

therapy sessions a week for four weeks; prescribed pain and muscle relaxant

medications; and advised Plaintiff not to return to work for one week.  (Tr. 377.)

Between May 1994 and August 1997, when Dr. Awad retired from medical

practice, Plaintiff was treated by Dr. Awad on more than 20 different occasions.

(Tr. 265-74, 741.)

On June 10, 1994, an MRI was taken of Plaintiff's back.  Dr. Awad

reported on review of the June 10, 1994 X-rays that they showed spondylolysis

---

(Footnote Continued from Previous Page)
been treated by Dr. Awad.  After the 1982 accident, Plaintiff complained of pain
in the neck, the right shoulder, the upper back, and of having headaches.
(Tr. 452.)  In 1983, Plaintiff also complained of pain in the right hand.  (Tr. 454.)
In 1986, Dr. Awad determined that Plaintiff's condition had become permanent.
(Tr. 459.)  In 1991, Plaintiff complained of pain and numbness in the right arm
and hand.  (Tr. 455-56.)  And in November 1991, Dr. Awad diagnosed Plaintiff as
having fibromyalgia and treated her with injections at trigger points.  (Tr. 460.)

at L5 bilaterally.  (01-611 Tr. 332.)[4]  Dr. David A. Larson, a neuroradiologist at Minnesota Diagnostic Center who also interpreted Plaintiff's MRIs, reported that the June 10, 1994 MRI of the cervical spine showed "very mild disc degenerative changes at the C4-5 level," and concluded that the June 10, 1994 MRI of the lumbosacral spine showed that the pedicles were intact, and the vertebral body height was normally maintained.  (01-611 Tr. 299.)

In late June 1994, Plaintiff reported to Dr. Awad that she had low back pain, neck pain, shoulder pain, and that she had been having difficulty sleeping due to the pain.  (Tr. 417.)  Dr. Awad diagnosed spinal strain, cervical and lumbosacral with spondylolysis, and prescribed Plaintiff sleeping medication and ordered her to stay off work, to continue physical therapy, and to wear a back brace.  (*Id.*; *see also* Tr. 747.)

In July 1994, additional MRIs were taken of Plaintiff's back.  Dr. Awad testified that MRIs of Plaintiff's lumbar spine showed a small central-left disc herniation at L5-S1 with mild posterior displacement of the left S1 nerve root, as well as the pars defect (spondylolysis) on the left side.  (Tr. 419, 747.) Dr. Larson concluded that the July 1994 MRI of the lumbar spine showed disc degenerative changes at the L3-4, L4-5, and L5-S1 levels.  (01-611 Tr. 298.)

---

[4]     Throughout this Report and Recommendation, reference to the administrative transcript for Plaintiff's previous case before the United States District Court, District of Minnesota, Civ. No. 01-611 (RHK/JMM), is made by using the abbreviation "01-611 Tr."  The ALJ in the present case admitted the previous transcript into evidence at the July 17, 2007 hearing.  (*See* Tr. 758.)

Over the next several visits, Plaintiff complained to Dr. Awad of severe pain in the neck and the left shoulder, severe low back pain going into the sacral area and into the left buttock, swelling in that area, and pain radiating into the right lower extremity and foot with tingling sensation. (Tr. 420-21.)  Dr. Awad diagnosed Plaintiff with spinal strain, and neck and back pain due to the motor vehicle accident.  (Tr. 422.)  He prescribed continued therapy, continued medications, no work for one month, restrictions including avoiding lifting or carrying objects weighing over 15 pounds, and no repeated reaching, bending, pushing, or pulling.  (Tr. 422-23.)

On August 24, 1994, Plaintiff was seen by Dr. Awad again.  This time, Plaintiff complained of severe back and leg pain, discomfort from bladder sensation of fullness, and numbness and pain in the right hand.  (Tr. 423.)  Dr. Awad diagnosed Plaintiff with spinal sprain L5-S1 spondylolysis, low back pain, and neck pain, and prescribed a sacroiliac brace, medication for sleep and pain, and recommended taking off work for another month.  (Tr. 424.)

On September 14, 1994, Plaintiff continued to complain to Dr. Awad of severe back pain, pain in the buttocks and calf muscles, and bladder urgency. (*Id.*)  She reported that the brace helps but that there was still upper back and leg pain at the end of the day.  (*Id.*)  Dr. Awad prescribed daily swimming exercise in a pool and Ibuprofen.  (Tr. 425.)

6

On October 5, 1994, Plaintiff complained of pain and tightness in the low back that radiates into the buttocks, thighs, and legs, which creates problems for sleeping.  (Tr. 425.)  She also reported shoulder blade pain and pain in the right arm and hand, along with headaches.  (*Id.*)  Upon examination, Dr. Awad found tenderness over the muscles from the head to the shoulders, and tenderness over the pelvis.  (Tr. 426.)  He diagnosed Plaintiff with spinal strain, back pain, and traumatic spondylolysis due to the May 6, 1994 accident.  (*Id.*)  Dr. Awad prescribed using a heating pad at home for half a minute twice a day, taking a muscle relaxant, rest, and advised to stop work until re-evaluation.  (Tr. 427.)  Plaintiff was re-evaluated on November 2, 1994.  (*Id.*)  At that time, Plaintiff complained of increased problems with her right hand and thumb, and back pain in the upper and lower back, but reported that her sleeping had improved.  (Tr. 427-28.)  Dr. Awad diagnosed Plaintiff with neck pain, right C-6 irritation, and myofacial pain (fibromyalgia).  (*Id.*)  He prescribed a cervical traction unit so that Plaintiff could do the treatment at home, and advised her to stay off work for a month.  (*Id.*)

Dr. Awad next saw Plaintiff on November 30, 1994.  (*Id.*)  Plaintiff complained of neck pain, pain and weakness in the hands, and low back pain on and off.  (Tr. 429.)  Plaintiff, however, reported that the cervical traction helps relieve the pain.  (*Id.*)  Dr. Awad prescribed Plaintiff medication, told her to use the heating pad twice a day for pain relief and to wear her brace, and

recommended that she purchase the cervical traction unit so that she could use it at home twice a day.  (*Id.*)  Plaintiff was again instructed to take off from work another month.  (*Id.*)

On December 27, 1994, Plaintiff complained of headaches, stiffness and pain in the neck, and pain in her right thumb.  (*Id.*)  She also complained of a sharp pain in her tailbone, low back pain, pain in the left knee area, and sleeplessness.  (Tr. 430.)  Plaintiff reported that the cervical traction helped and that she swam three times a week.  (*Id.*)  Dr. Awad prescribed pain relievers, the heat applications, the cervical traction, and recommended staying off from work another month.  (*Id.*)

Dr. Awad saw Plaintiff on several occasions in 1995, 1996,[5] and 1997, with similar types of complaints, and gave her similar prescriptions.  (*See* Tr. 430-36.)  Notably, however, in May, July, and November 1995, and in January 1996, Dr. Awad reported that Plaintiff had normal strength in her arms and legs, bilaterally active and symmetrical deep tendon reflexes, and intact sensory pinprick and touch sensation.  (01-611 Tr. 316, 317, 319, 322; Tr. 476.)  And in April 1996, Dr. Awad noted that Plaintiff suffered "moderately restricted" range of motion in her neck, and "mild weakness" of her right grip.  (01-611 Tr. 315.)

---

[5]   On August 8, 1996, Plaintiff had surgery on her right wrist and ulnar nerve. (Tr. 384, 436.)

At his November 18, 1996 deposition, Dr. Awad testified that Plaintiff's range of motion was in some respects slightly better in 1991, and in some respects slightly better after the accident in 1994.  (Tr. 464.)  He also opined that Plaintiff's injuries had, and would, cause limitations for her.  (Tr. 441.)  He stated that she would need to wear a belt or lumbosacral corset to protect her back, and that she would be limited in her ability to perform tasks that required repeated bending or reaching activities, such as shoveling snow or raking leaves or carrying anything weighing more than 15-20 pounds.  (Tr. 442.)  Dr. Awad predicted at that time that Plaintiff would need to see a physician approximately four times each year and that she would need one or two courses of physical therapy each year.  (Tr. 443.)

Thereafter, in February 1997, Dr. Awad reported that Plaintiff's range of motion in her neck and back were "moderately limited," and in May 1997, reported that Plaintiff suffered from "mild" muscle spasms in her back.  (01-611 Tr. 110, 311.)  Plaintiff was last seen by Dr. Awad on August 19, 1997.  At that time, Dr. Awad reported that Plaintiff's upper extremity muscle strength showed mild weakness of the right hand grip and her lower extremity muscle strength was within the normal range.  (01-611 Tr. 308.)  Plaintiff underwent trigger-point injections at that time, and Dr. Awad recommended that Plaintiff continue with her medications.  (01-611 Tr. 308.)  Approximately one year later, in February 1998, Dr. Awad noted on a prescription pad that Plaintiff "ha[d] been unable to

9

work since April 1995 because of injury in a car accident about one year earlier .

. . until[] I retired in August 1997." (Tr. 748; 01-611 Tr.307.)[6]

Plaintiff was also seen by other physicians during the relevant time period.

For example, Plaintiff was also seen by Dr. Richard Golden, a neurologist, in

March 1996.  At that time, he noted that she had a range-of-motion limitation in

her neck and lumbar spine, and recommended an active, supervised exercise

program.  (Tr. 22; 01-611 Tr. 290.)  Then, after an evaluation in September 1996,

Dr. Golden opined that Plaintiff's injuries were permanent and stated that heavy

lifting and heavy housework had been limited.  (Tr. 385; 01-611 Tr. 276.)

Plaintiff was also seen by Dr. Jack M. Bert between May 1996 and May

1998 for low back pain, right knee pain, and fibromyalgia.  (01-611 Tr. 345, 360.)

In September 1996, after performing surgery on Plaintiff's right wrist and ulnar

nerve in August, Dr. Bert recommended that Plaintiff avoid repetitive usage

activities with her hand and elbow, aggressive work activity involving the use of

her right hand and elbow, and sports activities.  (Tr. 385.)  Dr. Bert referred

Plaintiff to Landmark Orthopedics for occupational therapy.

On October 3, 1996, Plaintiff's occupational therapist, Lori Edwardsen,

stated in her treatment note that Plaintiff complained at that time of back, neck,

---

[6]     Plaintiff asserts that, in response to the litigation that had commenced
regarding her accident, her attorney had requested Dr. Awad to confirm her
continued disability from work so that her back-wage payments could be
submitted for payment; this note, she asserts, was Dr. Awad's confirmation.
(Tr. 742.)

and joint pain.  (Tr. 398)  Edwardsen also reported, however, that Plaintiff had

pain and stiffness specifically related to her surgery, and that her scars appeared

to be well healed.  (*Id.*)  In addition, Edwardsen reported that Plaintiff had "mild

limitations in grip, yet low endurance," and had "moderate limitations in right

functional pinches."  (*Id.*)  Then, on October 9, 1996, Edwardsen noted that

Plaintiff reported temporary relief after an October 7, 1996 ultrasound and was

demonstrating increased active wrist flexion and radial deviation.  (*Id.*)

On October 20, 1996, after interviewing Plaintiff, Martin S. Dockman, an

employment counselor, submitted a letter about Plaintiff's past work history and

her employability.  (Tr. 382-89.)  He detailed some of the medical treatment that

Plaintiff had received after her accident, including reference to Plaintiff's X-rays,

MRIs, therapy, and surgery on her right arm and elbow.  (Tr. 384.)  He referred to

a May 17, 1995 report from Dr. Awad in which Dr. Awad opined that Plaintiff

sustained a rather severe spinal sprain during the May 1994 motor vehicle

accident, which resulted in partial permanent disability of her spine of 20%.

(Tr. 385.)  Dockman also referred to a September 9, 1996 report from Dr. Bert in

which Dr. Bert stated that Plaintiff "should avoid repetitive usage activities with

her hand and elbow," and that "[s]he should avoid aggressive work activity

involving usage of her right hand and elbow as well sports activities."  (*Id.*)  In

addition, Dockman noted that on September 18, 1996, Dr. Golden wrote that

Plaintiff's "injuries are all permanent . . . Heavy lifting and heavy housework have

11

been limited." (*Id.*)  Ultimately, Dockman opined that Plaintiff was "not now totally

unemployable," but that she was "extremely limited in what she can do."

(Tr. 388.)  He stated that in his opinion, Plaintiff could perform certain limited,

part-time cashier work, but that she would be taking a substantial wage loss in

doing so.  (Tr. 388-89.)  He also stated that "[u]nless there is some remarkable

and dramatic recovery at some point in the future, there is no reason to believe

that her employability situation will ever change."  (Tr. 389.)

Thereafter, in October 1997 and May 1998, respectively, Dr. Bert

surgically repaired a tear in Plaintiff's right knee and repaired her left knee.

(Tr. 526; 01-611 Tr. 340, 342.)  Dr. Bert reported that Plaintiff was "doing well"

after each surgery, and recommended that Plaintiff exercise and follow up in the

future.  (01-611 Tr. 340, 342.)  In September 1997, Dr. Bert referred Plaintiff for

an MRI.  Dr. Heithoff, the physician who evaluated the MRI, concluded the

following regarding Plaintiff's back:

> 1.  Multilevel degenerative disc disease of the lumbar spine from
> L2-3 through L5-S1 with a high signal intensity central annular tear
> at the L5-S1 disc without herniation or stenosis.
>
> 2.  There is no evidence of spondylolysis of the L5 vertebra and no
> spondylolisthesis.
>
> 3.  There is essentially no change when compared to the prior study
> in 1994.

(01-611 Tr. 360-61.)

Beginning in January 1998, Plaintiff was treated by Dr. Mark Agre. Dr. Agre set forth Plaintiff's limitations in a "Fibromyalgia Questionaire" (Tr. 498-501), and in a document entitled "Medical Assessment of Ability to do Work-Related Activities (Physical)." (Tr. 502-05.)  There, Dr. Agre indicated that Plaintiff has suffered from fibromyalgia, chronic neck, shoulder, knee, and low back pain since the mid-1990's. (Tr. 498.)  He stated that Plaintiff suffered from fatigue, morning stiffness, chest-wall pain, sleep disturbance, joint pain, headaches, and cold sensitivity. (Tr. 499.)  Dr. Agre opined that Plaintiff would require a job that permits shifting positions at will with low to moderate stress, and that she would need to take unscheduled breaks during the work day. (Tr. 500-01.)  More specifically, Dr. Agre opined that Plaintiff should be limited to lifting no more than five to ten pounds occasionally and less than five pounds frequently, and standing no more than two to three hours in an eight-hour day with frequent breaks. (Tr. 502-03.)  He opined that Plaintiff could sit for six to eight hours in an eight-hour day with breaks allowing her to stand and walk. (Tr. 503.)  Dr. Agre estimated that Plaintiff's impairments could cause her to be absent from work three to four days per month. (Tr. 501.)

## III.    Testimony at the Administrative Hearing

### Medical Expert Testimony

At the July 17, 2007 administrative hearing, Dr. Andrew Steiner testified as a medical expert, and acknowledged that Plaintiff received treatment for neck

and back pain that resulted from the May 6, 1994 automobile accident, and also received treatment for generalized pain with headaches that was attributed to fibromyalgia.  (Tr. 760.)  He stated that Plaintiff's diagnosis was a sprain condition, with some findings of degenerative disc disease at several levels.  (*Id.*) Dr. Steiner also explained that Plaintiff was diagnosed with a small, central herniation in July 1995, and was diagnosed with spondylolysis in the lumber spine.  (*Id.*)  Dr. Steiner, however, noted that because there was no neurological loss documented, he believed the diagnosis was a sprain condition.  (*Id.*)  He also observed that the surgical treatments for the ulnar injury and for the right thumb problem both produced good results.  (Tr. 760-61.)

Dr. Steiner testified that "because the spinal conditions were not associated with any kind of a neurological loss," and the results of Plaintiff's surgeries were "technically successful," none of Plaintiff's conditions met or equaled the requirements of any listing.  (Tr. 761-62.)  He also testified that Plaintiff's knee degeneration conditions would not result in meeting or equaling any listed impairment.  (Tr. 762.)

Dr. Steiner opined that the medical records between May 6, 1994, and March 31, 1999, including the new records, supported limiting Plaintiff to sedentary work with additional limitations due to her thumb, carpal tunnel, and elbow conditions, her neck problems, her low back condition, and her knee problems.  (Tr. 762-63.)  Specifically, Dr. Steiner testified that he would limit

14

Plaintiff to a sedentary exertion level with additional limitations including no

power gripping on the right, and only occasional overhead work, bending,

twisting, kneeling, crawling, crouching, and climbing.  (*Id.*)  Dr. Steiner testified

that the limitations given by Dr. Agre in March 2003 were generally consistent

with his findings, but that the additional limitations of needing frequent breaks

placed on Plaintiff by Dr. Agre were inconsistent with the record as a whole, and

instead were likely the result of a judgment made based on pain reports, which

would be a credibility issue regarding Plaintiff.  (Tr. 763-74.)  Dr. Steiner

explained that "there is no medical test that will tell a doctor that frequent breaks

are . . . mandated by any condition[.]"  (Tr. 764.)  Dr. Steiner stated, however,

that he believed Dr. Agre's treatment seemed reasonable for Plaintiff's

conditions, and he acknowledged that there were no indications in the record

that Plaintiff was malingering or that she exaggerated her condition.  (Tr. 765.)

**Vocational Expert Testimony**

Kenneth Ogren testified at the administrative hearing as a vocational

expert.  The ALJ posed the following hypothetical to Ogren:

> [A]ssume that you had a hypothetical woman with the same
> educational and vocational background as [Plaintiff] with
> impairments of fibromyalgia syndrome and degenerative joint
> disease of the right knee, and right carpal tunnel syndrome,
> osteoarthritis of the right thumb, and a diagnosis of obesity and
> degenerative disc disease of the cervical spine, temporal mandibular
> joint dysfunction[,] and . . . degenerative disc disease of the
> lumbosacral spine, and sprain/strain conditions of the neck and
> back.

. . . .

> [I]f this hypothetical woman had those impairments . . . and if
> that combination of impairments were to limit that woman to light
> work as defined by the Dictionary of Occupational Titles and the
> Social Security Act, with the balancing limited to frequent,
> occasional climbing of stairs or ramps, occasional stooping,
> kneeling, crouching or crawling.  Occasional overhead work or
> occasional overhead reaching with either arm.  And well, within
> those limitations would that hypothetical woman be able to do any of
> [Plaintiff's] past work?

(Tr. 766-67.)  Ogren testified that the hypothetical woman "could perform

[Plaintiff's] past relevant work with the exception of the trade show

merchandiser."  (Tr. 767.)  Ogren explained that "[t]rade show merchandiser

would be working overhead work, hanging things and stuff like that, so she

couldn't do that job, but the rest she could do."  (*Id.*)  Ogren confirmed that a

scheduler, medical assistant, office manager, and administrative assistant would

all be possible jobs that Plaintiff could perform.  (*Id.*)

The ALJ then asked Ogren whether any of that past work would be

possible if the hypothetical person with the same limitations previously given also

was limited, because of chronic pain, to a range from low-end semi-skilled work

with a specific vocational preparation ("SVP") of four[7] or less to unskilled work.

---

[7]    Specific Vocational Preparation is defined by the Dictionary of
Occupational Titles as the amount of lapsed time required by a typical worker to
learn the techniques, acquire the information, and develop the facility needed for
average performance in a specific job-worker situation.  "4" indicates that the job-
worker situation takes over three months up to and including six months to reach
the SVP.  Dictionary of Occupational Titles, Appendix C: Components of the
Definition Trailer (4th ed., Rev. 1991).

(*Id.*)  Ogren responded, stating "that would eliminate all past work."  (*Id.*)  The ALJ then asked Ogren whether there were any other jobs that came within that hypothetical.  (Tr. 768.)  Ogren testified that there were.  Specifically, Ogren listed an information clerk, referral and information aide, and companion.  (*Id.*)  Ogren confirmed that these were lower-end semi-skilled jobs.  (*Id.*)

The ALJ then asked Ogren whether any of Plaintiff's past work would be possible if the hypothetical person with the same physical limitations previously given was limited to sedentary work, but was without the limitations of semi-skilled work.  (Tr. 768-69.)  Ogren responded, stating, "Yes, she could go back to the scheduler, office manager, administrative assistant."  (Tr. 769.)

The ALJ also asked Ogren whether any of Plaintiff's past work would be possible if the hypothetical person with the same physical limitations previously given was limited to work with an SVP of four or less.  (*Id.*)  Ogren stated that "that would knock out the past relevant jobs."  (*Id.*)  The ALJ then asked Ogren whether there were any other jobs that came within that hypothetical.  (*Id.*)  Ogren opined that the same three sendentary jobs provided before would apply.  (*Id.*)

The ALJ also asked Ogren whether a hypothetical person with the previously mentioned limitations, who would also require the ability to change positions from sitting to standing at will, would require taking unscheduled work breaks throughout the day of five to ten minutes, and would be absent from work

17

three to four times a month, would be competitively employable by any of
Plaintiff's past work.  (Tr. 770.)  Ogren testified that such a person could not
perform Plaintiff's past work, nor could such a person perform the other work
previously mentioned.  (*Id.*)  Ogren explained that the frequency of the
unscheduled breaks had not been identified, but if Plaintiff had two of the three
limitations she would not be employable.  (*Id.*)  Ogren also stated, however, that
if Plaintiff had just four unscheduled breaks, he did not believe it would preclude
Plaintiff from competitive employment.  (Tr. 771.)

**Plaintiff's Testimony**

During Plaintiff's deposition, Plaintiff described the circumstances
surrounding the May 6, 1994 accident.  She stated that she was riding in a
shuttle van when a Geo Tracker ran through a light and hit the van.  (Tr. 198.)
She testified that she hit her left arm and may have hit her head, and that she
received bruises on both of her elbows, her right arm, and her left shin.  (Tr. 198-
99.)  Plaintiff stated that once she was allowed to leave the scene of the
accident, she walked to her car approximately 500 feet away, got into her car,
picked up a pizza that she had previously ordered, and then drove home.
(Tr. 202.)  At the July 17, 2007 administrative hearing, Plaintiff testified that she
had just started a new job working for a physician on the Monday before the
accident occurred.  (Tr. 773.)  She testified that she was never able to return to
her job after the accident.  (Tr. 774.)

18

**IV.    The ALJ's Findings and Decision**

On August 31, 2007, the ALJ issued a Decision concluding that Plaintiff was not under a disability as defined by the Social Security Act and therefore denying Plaintiff's application for a period of disability and disability insurance benefits.  (Tr. 17-30.)  The ALJ followed the sequential five-step procedure as set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform the past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform."  *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 6, 1994, therefore meeting the requirement at the first step of the disability determination procedure.  (Tr. 22.)  The ALJ also

determined that Plaintiff's insured status for purposes of entitlement to disability insurance benefits expired as of March 31, 1999. (Tr. 22.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of "fibromyalgia syndrome, degenerative disc disease with neck and back strain, obesity, right upper extremity ulnar nerve entrapment status post transposition and right thumb surgery, and bilateral meniscal tears in the knees status post bilateral arthroscopic repair[,]" but that Plaintiff did not have an impairment or combination of impairments that met any of the criteria listed in the regulations. (Tr. 22-23.)

The ALJ determined that Plaintiff had the RFC to perform "sedentary work involving lifting 10 pounds occasionally, sitting six hours and stand/walking two hours in an eight-hour workday, with only occasional overhead reaching, occasional balancing, stooping, kneeling, or crawling, that involves only semi-skilled tasks." (Tr. 23.) In reaching this RFC determination, he concluded that Plaintiff's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of these systems were not entirely credible. (Tr. 25.)

At steps four and five of the disability determination procedure, the ALJ found that Plaintiff did not retain the RFC to perform any of her past relevant work, but, based on the medical vocational guidelines and the testimony of the vocational expert, did retain the RFC to make a vocational adjustment to work

that exists in significant numbers in the national economy.  (Tr. 29-30.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability

benefits may be awarded.  "Disability" under the Social Security Act means the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  "An

individual shall be determined to be under a disability only if his physical or

mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in

the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability

benefits to a claimant is limited to a determination of whether the decision of the

Commissioner is supported by substantial evidence on the record as a whole.

42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There

is a notable difference between 'substantial evidence' and 'substantial evidence

on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.

1987).  Substantial evidence is "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations

omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)

("Substantial evidence is less than a preponderance, but enough that a

reasonable mind might accept it as adequate to support a decision.").

"'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing

analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in

reviewing administrative findings is more than a mere search of the record for

evidence supporting the [Commissioner's] findings." *Id.* In reviewing the

administrative decision, "'[t]he substantiality of evidence must take into account

whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal*

*Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not

substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210,

1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision

merely because evidence may exist to support the opposite conclusion. *Mitchell*

*v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213

(concluding that the ALJ's determination must be affirmed, even if substantial

evidence would support the opposite finding). The possibility that the Court

could draw two inconsistent conclusions from the same record does not prevent

a particular finding from being supported by substantial evidence. *Culbertson v.*

*Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability

insurance benefits and supplemental security income under the Social Security

Act.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065,

1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

Once the claimant has demonstrated that he or she cannot perform past work

due to a disability, "the burden of proof shifts to the Commissioner to prove, first

that the claimant retains the residual functional capacity to do other kinds of

work, and, second that other work exists in substantial numbers in the national

economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857

(8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff asserts she has been unable to work since May 11, 1994,

(Tr. 188), because of "fibromyalgia, degenerative disc disease of the cervical and

lumbar spine, bilateral meniscus tears of the knee with history of bilateral

reparative arthroscopic surgery, right ulnar neuritis with history of corrective

surgery in August 1996, right thumb degenerative joint disease, migraine

headaches, and left hip bursitis."  (Doc. No. 6, Pl.'s Mem. in Supp. of Mot. for

Summ. J. 3.)  Plaintiff also alleges several errors in the ALJ's evaluation of her

disability claim.  First, she argues the ALJ erred by giving more weight to the

opinion of a non-examining, non-treating physician than to her treating physician.

Second, she alleges the ALJ erred by failing to follow proper principles of law in

determining her credibility.  Third, she contends that the ALJ's decision that she

23

could perform other work was based on a faulty hypothetical question posed to the vocational expert.  And fourth, she contends that the ALJ erred in applying the "grid" rules mechanically and that a disability finding should be made here. This Court will address each of Plaintiff's arguments in turn.

### A.    Evaluating the Physicians' Opinions

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician."  *Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005).  Also, "the ALJ must not substitute his opinion for that of the physician."  *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

If an ALJ determines not to grant controlling weight to a treating physician's opinion, medical opinions are further evaluated under the framework described in 20 C.F.R. § 404.1527.  Under such framework, the ALJ should consider the following factors in according weight to medical opinions:

(1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the quantity of evidence in support of the opinion; (5) the consistency of the opinion with the record as a whole; and (6) whether the source is also a specialist.  20 C.F.R. § 404.1527(d).

Plaintiff asserts that the ALJ did not rely on any physician's medical opinion, but instead substituted his own lay opinion with regard to Plaintiff's RFC based on testimony by the non-treating, non-examining physician at the hearing. In addition, Plaintiff contends that it was error for the ALJ to not include all of the limitations identified by Plaintiff's treating physicians Dr. Agre, Dr. Awad, Dr. Bert, and Dr. Golden in Plaintiff's RFC.  She asserts that her treating physicians' opinions are not conclusory and are not only supported by objective findings in the record, but are also uncontradicted by any other medical evidence in the record.  Defendant disagrees, asserting that the ALJ did rely on physician opinion when determining Plaintiff's RFC, and that the ALJ explained how his RFC assessment was consistent with the medical opinions of record in his decision.

This Court agrees with Defendant.  Plaintiff's argument that the ALJ did not rely on any physician's medical opinion is meritless.  The ALJ used six pages of his decision to analyze and determine Plaintiff's RFC in this case, and in doing so specifically referenced the opinions, notes, and records from Dr. Awad,

Dr. Golden, Dr. Bert, and Dr. Agre, all of whom were Plaintiff's treating physicians.  In addition, after weighing the evidence from the record as a whole, the ALJ did include those limitations indicated by Plaintiff's treating physicians when he found them supported by the record.  Those limitations, he explained, were simply inconsistent with complete disability.

Specifically, the ALJ acknowledged that Dr. Awad assessed Plaintiff with a 20% partial permanent disability.  (Tr. 28; *see* Tr. 385.)  The ALJ, however, also determined that Dr. Awad's assessment was consistent with the conclusion that Plaintiff is not completely disabled by her impairments.  (Tr. 28.)[8]  The ALJ acknowledged that Dr. Golden had indicated that Plaintiff would experience some level of pain for the rest of her life, and that she would not be able to engage in heavy lifting or heavy housework.  (Tr. 28; *see* Tr. 385.)  The ALJ concluded that Dr. Golden's opinion, however, was consistent with the ALJ's RFC conclusion, which limits Plaintiff to sedentary work.  The ALJ also referred to Dr. Bert's 1996 letter, which advised Plaintiff to avoid repetitive usage activities with her hand and elbow, aggressive work activities that involved her hand and elbow, and engaging in sports activities.  (Tr. 28; *see* Tr. 385.)  Here, the ALJ

---

[8]     Dr. Awad also testified that in 1996, Plaintiff needed to wear a belt or lumbosacral corset, avoid repetitive bending and reaching activities, and avoid lifting objects weighing more than 15-20 pounds.  (Tr. 442.)  This Court notes that the ALJ's determination that Plaintiff's RFC is limited to sedentary work, which has a maximum lifting limit of ten pounds, *see* 20 C.F.R. § 404.1567(a), is consistent with Dr. Awad's testimony.

concluded that a limitation to sedentary work was consistent with Dr. Bert's limitations.  (Tr. 28.)

Further, the ALJ considered Dr. Agre's 2003 medical assessment of Plaintiff's ability to do work related activities, even though the assessment was given after the expiration of Plaintiff's insured status.  The ALJ found that Dr. Agre's opinion that Plaintiff was capable of sedentary work that involved occasionally lifting 5-10 pounds, standing/walking two to three hours, and sitting six to eight hours with breaks, with various postural limitations (*see* Tr. 502), was mostly consistent with his RFC finding.  (Tr. 28-29.)  Dr. Agre's 2003 opinion, however, also included that Plaintiff could sit for at least two hours and stand for at least six hours of an eight-hour workday, as long as Plaintiff was provided *frequent breaks*, and that Plaintiff would be absent from work three to four times each month because of her impairments.  (Tr. 503.)  When determining whether frequent breaks should be a limitation provided for in Plaintiff's RFC, the ALJ considered and found Dr. Steiner's testimony regarding whether Plaintiff would need frequent breaks relevant.  (Tr. 29.)  When Dr. Steiner was asked if he agreed that fibromyalgia would require a need for frequent breaks, he responded that no medical test existed that would tell a doctor whether or not a patient required frequent breaks regardless of their particular diagnosis.  (Tr. 764.) Dr. Steiner further stated that based on his review of the record as a whole, he

disagreed with Dr. Agre's opinion that Plaintiff required frequent breaks.
(Tr. 764.)

This Court concludes that the portion of Dr. Agre's assessment that provides the limitation that Plaintiff would require frequent breaks in order to work, is not supported by the evidence and, therefore, the ALJ did not err in declining to accord controlling weight to this portion of Dr. Agre's opinion. Dr. Agre's 2003 assessment provides no explanation or findings to support his opinion that Plaintiff would need to take frequent breaks.  Moreover, nowhere in the objective medical evidence of record, including Dr. Agre's own treatment notes, is there any indication that Plaintiff would need to take frequent breaks in order to work.  On the other hand, Dr. Steiner's opinion is supported, among other record evidence, by Mr. Dockman's opinion from 1996, which states that after his review of the record (from 1994 to 1996), he believed that Plaintiff could perform some work.  (Tr. 388.)  Therefore, the record as a whole fails to support Dr. Agre's opinion that Plaintiff would have needed to take frequent breaks in order to work.  The ALJ properly declined to accord controlling weight to the opinion of Plaintiff's treating physician, Dr. Agre, because it was not supported by objective medical evidence, and is in conflict with the opinions of Plaintiff's other treating physicians.

**B.    Credibility Analysis**

In his decision, the ALJ stated that Plaintiff's subjective statements are not entirely credible.  (Tr. 25.)  Plaintiff asserts, however, that her statements are consistent with the opinions of Dr. Agre, Dr. Awad, Dr. Bert, and Dr. Golden, and that the ALJ erred by not evaluating all of the *Polaski* factors.  In support, Plaintiff asserts that the ALJ in fact acknowledged that there were third party statements consistent with Plaintiff's testimony, yet still found Plaintiff's subjective allegations not fully credible.  Plaintiff also asserts that the ALJ erred by not addressing the comment made by the medical expert at the hearing that the record does not indicate any malingering or exaggeration of symptoms by Plaintiff.  (*See* Tr. 765.)

When determining the credibility of a claimant's subjective allegations, the ALJ must consider evidence such as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ must take these factors into account, but does not need to discuss how each factor relates to plaintiff's credibility.  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)).  The ALJ may discredit subjective complaints when they are inconsistent with the evidence as a whole.  *Id.*  But the ALJ must detail his reasons for discrediting the testimony.  *Cline v. Sullivan*, 939 F.2d 560, 565 (8th

29

Cir. 1991).  "If an ALJ explicity discredits the claimant's testimony and gives good

reason for doing so, [the Court] will normally defer to the ALJ's credibility

determination."  *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003); *see also*

*Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992) (stating that even if the

record could support more than one reasonable conclusion, the reviewing court

should affirm the Commissioner's reasonable conclusion).

This Court concludes that the record establishes that the ALJ did evaluate

the entire record, including the claimant's testimony, in accordance with the

provisions of *Polaski*.  The ALJ specifically cited factors set forth in agency

regulations, which include the *Polaski* factors, and followed those in making his

credibility findings.  (Tr. 24.)  The ALJ, therefore, took the *Polaski* factors into

account when determining the Plaintiff's credibility.

The ALJ stated that "[a]fter considering the evidence of record, the

undersigned finds that the claimant's medically determinable impairments could

have been reasonably expected to produce the alleged symptoms, but that the

subjective statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely credible."  (Tr. 25.)  The ALJ then stated:

> When considering this record as a whole, the Administrative Law
> Judge cannot find the premise of the claimant's allegations credible.
> The claimant has parlayed a minor motor vehicle accident that she
> walked away from and did not seek medical attention for until
> several days later, into a life long disability.  This is simply not
> reasonable.  The claimant describes her pre-accident lifestyle and
> accomplishments in near-superhuman terms, all of which ended
> abruptly on the alleged onset date.  It is difficult to give credibility to
> this argument since Dr. Awad testified in a deposition dated

November 18, 1996, that he had been treating the claimant with
medication for fibromyalgia pain since 1991, and he continued with
the same treatment for FMS after the accident.  The undersigned
questions how the claimant's symptoms could be vastly different yet
treated in an identical fashion before and after the accident.  Even
the back strain/sprain incurred during the accident did not
significantly change the medical treatment prescribed by her
physician.

(Tr. 25-26.)  The ALJ then cited to numerous inconsistencies in the record that

he believed reduced Plaintiff's credibility:

- "The claimant described her daily activities from May 1994 through March
  1999 as getting up, taking her medication, sitting on a thermal pad, having
  breakfast, and returning to sit on the pad.  She said she did only very
  limited cooking, light dusting, and light gardening sitting on a stool.
  However, her husband describes her as determined and says that despite
  her symptoms she handles 90 percent or more of the "home front" and
  does it very well."  (Tr. 26.)

- "The claimant stated that walking is difficult and in her deposition said she
  could walk only one block.  This is inconsistent with Dr. Awad's records
  showing normal strength and no atrophy in the lower extremities, signs
  associated with chronic disuse of the muscles.  Her allegations are
  inconsistent with his note of May 9, 1995 that the claimant was to continue
  her exercise program of walking 30 minutes a day and swimming.  The
  claimant told him on that date that she feels better when she moves
  around. (Exhibit 4F p. 16)  Increase in activity was encouraged by her
  medical providers.  Dr. Golden's recommendation in March 1996 was for
  an active, supervised exercise program to treat the spinal sprain, and in
  January 1997 a physical therapist suggested participation in a fitness
  center program because of deconditioning.  Even so, the therapist noted
  that the claimant was making progress with the exercises and the claimant
  felt she was improving.  (Exhibits 2F p. 17, 3F)  Thus, the evidence does
  not support the degree of debilitation alleged by the claimant.  The
  claimant's medical providers wanted her to engage in more, not less,
  activity as treatment for her pain.  Clearly, the providers did not consider
  the claimant's medical impairments a cause for lack of activity."  (*Id.*)

- "The claimant attributes her lack of mobility, in part, due to knee pain.  She
  was evaluated by Dr. Jack Bert in 1997 and MRIs showed mild to

moderate meniscal tear on the right and a probable meniscal tear on the left.  Arthroscopic repair was performed on the right on October 9, 1997 and on the left on May 28, 1998.  According to Dr. Bert's follow-up records through September 1998, the claimant did well post surgery with only a little remaining effusion and mild pain.  He prescribed Arthrotec and recommended exercise.  (Exhibit 5F)  There is no evidence that the claimant returned to Dr. Bert or saw any other physician for knee problems prior to the date she was last insured for benefits."  (*Id.*)

- "At an examination [with Dr. Agre] in January 1998, the claimant had 16 of 18 positive FMS tenderpoints, myofascial pain complaints, and bursitis in the left hip.  However, she walked with a nonantalgic gait and the neurological examination was normal.  Dr. Agre tapered the claimant off of Flexeril which was becoming less effective, and started prescriptions for Darvocet and Ultram.  He encouraged the claimant to engage in low impact aerobic conditioning.  Dr. Agre's subsequent examinations show no objective abnormalities, and he treated her FMS pain with multiple trigger point injections which he said the claimant tolerated well.  (Exhibit 6F)  Thus, Dr. Agre's records document few objective abnormalities, and a series of injections for FMS pain at the claimant's request which she tolerated.  This is inconsistent with the claimant's testimony that she felt crazy for four days after the injections and actually refused to have additional injections."  (Tr. 27.)

- "The claimant asserts that even after her right ulnar nerve and thumb surgery in August 1996 she continues to have pain making it difficult to write or type.  This is inconsistent with the medical records of Dr. Bert, her orthopedic surgeon, who stated on November 5, 1996 that the claimant was doing much better with her hand and elbow after the surgery.  She had no significant complaints except some limitation of motion of the thumb, which was treated with two more weeks of physical therapy.  Dr. Bert told the claimant to return as needed for hand complaints, but there is no evidence that she did so despite seeing Dr. Bert frequently in connection with her knee problems.  Thus, it appears the claimant was satisfied with the results of the upper extremity surgery.  (Exhibit 5F)"  (*Id.*)

- The evidence shows that despite her allegations of difficulty writing or typing, the claimant has thoroughly completed numerous forms by hand, not only those requested by the Administration but also those produced by her attorney.  (Exhibits 3E, 4E)  Moreover, she kept a 62-page hand-written pain diary covering the period from the date of the accident through March 10, 1995.  (Exhibit B-1E)  The claimant has also submitted copies of

a three page letter to her attorney and a one page letter to a physician that she typed of her own volition . . . . Thus, neither the medical evidence nor the claimant's own activities support her allegation of ongoing significant limitations in the right upper extremity." (*Id.*)

- Even though the claimant testified to a very debilitated lifestyle, the evidence is not consistent with her allegations.  She testified that she has frequent bad days where she is unable to function.  In the deposition, she said that she has week-long flares of pain where she is down and unable to perform more than minimal self-care tasks.  However, Dr. Awad's records show that she was swimming at the YWCA three times a week in December 1994, and walking 30 minutes a day and swimming in May 1995.  (Exhibit 4F pp. 16, 19)  The claimant testified that she went on a family vacation in 1998 to several islands in the Caribbean.  She complained that the flying was hard on her back and she wasn't able to go scuba diving with everyone else.  She and her husband went on another vacation in 1999 to Sanibel Island in Florida.  In May 2001, which is after the date last insured, the claimant requested a prescription for seasickness pills because she was going to Grand Cayman.  (Exhibit B-15F p. 15) Moreover, the claimant stated in her deposition that she continues to do some sewing using scissors and a rotary cutter, maintains a daily journal, does some light gardening, grocery shops leaning on a cart, and reads a lot.  When asked by the Administrative Law Judge why she waited five years before applying for Social Security disability, the claimant replied that she thought she would be able to return to work and so had taken classes in floral art and floral design after the alleged onset date.  This evidence demonstrated a degree of activity that is inconsistent with her allegations of total disability."  (Tr. 27-28.)

While the ALJ did not explicitly and discretely analyze Plaintiff's credibility in the format set forth under *Polaski*, the failure to address each of the *Polaski* factors separately does not render the ALJ's determination invalid.  *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (stating that "[a]lthough specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because

the ultimate finding is supported by substantial evidence in the record"); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (stating that "[t]he ALJ was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations").  Because the ALJ thoroughly discussed—based on record evidence—the reasons why Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely credible, and because the ALJ utilized the *Polaski* factors in doing so, this Court concludes that the ALJ properly assessed the evidence and the record as a whole, and that the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence.

### C.    The Vocational Expert's Hypothetical

 Plaintiff contends that "the testimony used by the ALJ and adopted by the Commissioner cannot serve as substantial evidence in support of a finding of not disabled" because the ALJ did not include all of Plaintiff's limitations given by Dr. Agre in the ALJ's hypothetical question.  (Pl's Mem. 21.)  Defendant disagrees.

"Unless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant."  *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  However, an ALJ need not accept every limitation posed by a physician as true.  *See Pearsall v. Massanari*, 274 F.3d 1211, 1220

(8th Cir. 2001) ("The ALJ's hypothetical question properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit.").  "Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).

It appears that Plaintiff's complaint is that the hypothetical posed by the ALJ did not include Dr. Agre's limitation that Plaintiff needed to take frequent breaks.  As explained above in Section II.A., this Court concludes that the portion of Dr. Agre's assessment that provides the limitation that Plaintiff would require frequent breaks in order to work is not supported by the evidence.  Therefore, the ALJ did not err in declining to accord controlling weight to this portion of Dr. Agre's opinion, and the ALJ did not err by excluding this particular limitation from his hypothetical.  Thus, the ALJ's hypothetical question was proper and the vocational expert's conclusion based on that hypothetical was proper as well.[9]

### D.    Applying the Grid Rules

Plaintiff was 49 years old, 11 months short of her fiftieth birthday, on her date late insured.  She asserts that if she would have been age 50 at that time,

---

[9]    This Court notes that, having reviewed the record, including the opinions and assessments of the various physicians and experts, it finds that there is substantial evidence in the record to support the Commissioner's decision regarding Plaintiff's RFC and her ability to perform other jobs in the national economy.  *See Cruze v. Chater*, 85 F.3d 1320, 1326 (8th Cir. 1996) (finding vocational expert's testimony which was based on a properly phrased hypothetical question sufficient to support ALJ's decision).

she would have been found to be disabled under the grid rules.  Plaintiff argues
that the ALJ should not have applied the grid rules mechanically, and should
have found Plaintiff disabled since she was close to age 50 on her date last
insured.  This Court concludes that the ALJ did not err in classifying Plaintiff as a
"younger individual."

If a claimant is unable to perform her past relevant work due to her
impairment, the Social Security Administration will consider the claimant's RFC
combined with her vocational factors—which include age, education, and work
experience—to determine if the claimant can make an adjustment to other work.
*See* 20 C.F.R. § 404.1520(g)(1).  In considering age as a vocational factor, the
regulations provide that "'[a]ge' means your chronological age" and that the
Administration "will use the age categories in paragraphs (c) through (e) of
§ 404.1563."  *Id.* § 404.1563(a)-(b).

The ALJ classified Plaintiff as a "younger individual."  (Tr. 30.)  The
"younger person" category spans ages 45 to 49, while the "closely approaching
advanced age" category spans ages 50 to 54.  20 C.F.R. § 404.1563(c)-(d).
Subsection (b) of the regulation governing age categories provides that there is
to be some flexibility between the age categories in "borderline" situations:

> How we apply the age categories.  When we make a finding about
> your ability to do other work under § 404.1520(f)(1), we will use the
> age categories in paragraphs (c) through (e) of this section.  We will
> use each of the age categories that applies to you during the period
> for which we must determine if you are disabled.  *We will not apply
> the age categories mechanically in a borderline situation.  If you are
> within a few days to a few months of reaching an older age*

36

> *category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.*

20 C.F.R. § 404.1563(b) (emphasis added).  Other than concluding that Plaintiff is a "younger individual," the ALJ did not discuss Plaintiff's age categorization or the possibility that Plaintiff presented a "borderline" situation, in his opinion.

First, this Court notes that a borderline situation is defined in part as being "within a few days to a few months of reaching an older age category" (i.e., 50 years old).  Here, Plaintiff was 11 months shy of 50 years old on her date last insured.  Eleven months, in this Court's view, is more than a "few months." Therefore, the situation here does not constitute a "borderline" situation that required consideration from the ALJ.

Furthermore, even if being 11 months shy does constitute a borderline situation, "nothing in [20 C.F.R. § 404.1563(b)] obligates an ALJ to address a claimant's borderline age situation in his opinion or explain his thought process in arriving at a particular age-category determination."  *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008).  "Rather, the regulation merely promises claimant that the Administration will 'consider' veering from the chronological-age default in borderline situations."  *Id.*  The Associate Commissioner of Hearings and Appeals has provided an Appeals Council interpretation of 20 C.F.R. § 404.1563, entitled "Application of the Medical-Vocational Guidelines in Borderline Age Situations," which states that:

37

> [a]bsent a showing of additional adversity(ies) justifying use of the
> higher age category, the adjudicator will use the claimant's
> chronological age – even when the time period is only a few days.
> The adjudicator need not explain his or her use of the claimant's
> chronological age.

*Id.* at 399-400 (quoting HALLEX I-1-0-2).[10]   Examples of "additional vocational adversities" are "the presence of an additional impairment that infringes on the claimant's remaining occupational base; having only a marginal ability to communicate in English; or a history of work experience in an unskilled job in one isolated industry or work setting."   *Id.* at 397.   Here, there is no evidence in the record that Plaintiff suffered from any "additional vocational adversities" that might justify placing her in the higher age category.[11]   Given the record as a whole, therefore, the ALJ's benefits determination is supported by substantial evidence, and the ALJ did not err by using Plaintiff's chronological age, which was 49, when determining whether Plaintiff could make an adjustment to other work.

---

[10]     HALLEX is the procedural guidance that the Social Security Administration provides to staff and its adjudicators.

[11]     During her 1995 deposition and later in her 2003 Activities of Daily Living Questionnaire, Plaintiff reported that among other things, she dusts and polishes the furniture, changes the sheets from her hands and knees once a week, cleans the whole house on Thursdays, grocery shops, sews, reads, gardens (i.e., weeds), cans fruits and vegetables, cooks, folds clothes, and drives.  (Tr. 242-53, 286, 288, 297.)

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 5), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 12), be

**GRANTED**;

3.      The decision of the Commissioner of Social Security be **AFFIRMED**;

and

4.      This case be **DISMISSED WITH PREJUDICE**.


Date: May 15, 2009                      __*s/Jeffrey J. Keyes*_____
                                                        JEFFREY J. KEYES
                                                        United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 1, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.